**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SIGMA DEVELOPMENT | § | |
| CORPORATION, | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:16-cv-02555 |
| | § | |
| TGP SECURITIES, INC., BORIS | § | |
| EPSHTEYN AND JAMES TAMMARO, | § | |
| **Defendants.** | § | |
| | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TO THE HONORABLE COURT:**

Plaintiff files this First Amended Petition subject to the Motion to Remand previously filed. Plaintiff is filing this First Amended Petition to supplement the causes of action and does not concede to jurisdiction in federal court and reserves the right to proceed with this complaint in State Court. Plaintiff reserves the right to amend this petition should it be necessary at any given time.

The standard for determining if the plaintiff waived its right to seek remand is whether the plaintiff's affirmative conduct evidences an "unequivocal assent" to federal court jurisdiction (see *Fletcher v. Solomon*, 2006 WL 3290399, at *2 (N.D. Cal. Nov. 13, 2006)). However, a plaintiff does **not** necessarily waive its right to seek remand if it moves for remand before filing the amended pleading and the amendment is made solely as a defensive maneuver in response to a motion to dismiss (see *Swanson v. U.S. Bank, N.A.*, 2011 WL 1584836, at *1, *2 (D. Utah Apr. 26, 2011); *The Knit With v. Aurora Yarns*, 2010 WL 844739, at *8-*9 (E.D. Pa. Mar. 11, 2010) and *Newport v. Dell Inc.*, 2008 WL 2705364, at *4 (D. Ariz. July 2, 2008)).

Plaintiff, SIGMA DEVELOPMENT CORPORATION, through its representative, AZHAR CHAUDHARY LAW FIRM, P.C., at the time when the causes of action for this Petition arose, was the sole legal representative of Sigma Development Corporation, a Texas Corporation, and engaged in business transactions under the direct authority of Sigma Corporation, complains of Defendants, TGP Securities, Inc., a New Jersey Corporation, Boris Epshteyn and James Tammaro, and for cause of action shows:

## I.    Selection of Discovery Level

1.  The Plaintiff is requesting a tailored discovery control plan under Level 3 of the Texas Rules of Civil Procedure.

## II.    Statement of Relief Sought

2.  The Plaintiff seeks monetary relief of over $100,000.00.  The damages sought are within the jurisdictional limits of the court.

## III.    Parties and Service of Citation

1.  The Plaintiff is a Texas corporation a Texas corporation with its principal place of business located in Harris County, Texas, acting through its Principal and Director, attorney Azhar Chaudhary, who was and still is the legal representative of Sigma Development Corporation,

2.  The Defendant Boris Epshteyn is an individual residing in the State of New York, and he may be served with service of process at his home, at the following address:

> 155 W. 21st Street, Apartment 7G
> New York, New York 10011

3.  Alternatively, said Defendant Boris Epshteyn may be served with service of process at his place of work which is the following address:

> TGP Securities, Inc.
> 6 Glendale Road
> Summit, New Jersey 07901

4. The Defendant James Tammaro is an individual residing in the State of New Jersey, and he may be served with service of process at his home, at the following address:

> 6 Glendale Road
> Summit, New Jersey 07901

5. Alternatively, said Defendant James Tammaro may be served with service of process at his place of work which is the following address:

> TGP Securities, Inc.
> 6 Glendale Road
> Summit, New Jersey 07901

6. The Defendant TGP Securities, Inc. is a corporate entity, and said entity has its principal place of business in the State of New Jersey, and it may be served with service of process by serving its President, JAMES P. TAMMARO at the following address:

> TGP Securities, Inc.
> 6 Glendale Road
> Summit, New Jersey 07901

## IV.    Jurisdiction and Venue

**7.** Jurisdiction is proper in the State of Texas Judicial District Courts because the subject matter and the amount of controversy are within the jurisdictional limits of the State of Texas Judicial District Courts. Venue is proper in Fort Bend County, Texas because a portion of the $100,000.00 at issue was wired from a bank located in Fort Bend County, Texas.

8. Texas Long-Arm Statute. Per the Texas Long-Arm Statute (Tex. Civ. Prac. & Rem. Code §17.042), the Plaintiff asserts that the State of Texas has personal jurisdiction over these Defendants Epshteyn and Tammaro due to one or more of the following:

> a. The Defendants were doing business in the State of Texas by entering or attempting to enter into an agreement with the Plaintiff, who was representing a Texas

3

corporation, and either party was to perform the agreement, or attempt to perform the agreement, in whole or in part in the State of Texas;  and/or

   b.  The Defendants committed a tort in whole or in part in the State of Texas.

9.  The Texas Long-Arm Statute has broad "doing business" language which is intended to reach out for personal jurisdiction as far as the Federal Constitutional requirements of due process will allow; consequently, the Texas personal jurisdictional requirements are consistent with federal jurisdictional requirements.

10. Using the Federal Constitutional due process analysis, personal jurisdiction is achieved when the non-resident defendant has established minimum contacts with the State of Texas, and the establishing of jurisdiction complies with the traditional concept/belief of "fair play and substantial justice." *See Moki Mac,* 21 S.W.3d at 575, and *See also Int'l Shoe Co.   v. Washington,* 326 U.S. 310, 316 (1945).

11. In this particular lawsuit, the Plaintiff asserts that the Defendants Epshteyn and Tammaro purposefully conducted activities in the State of Texas, and the causes of action arose from and/or were related to those contacts or activities.

12. In the case of *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333 (Tex. 2009), the Texas Supreme Court stated the following:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person.   Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subjected to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

### V.   Relationship of Parties, Defendants' Contacts with the State of Texas, Background and Defendants' Material False Representations

13. On or about 11/21/2014 and 12/19/2014, the Plaintiff Azhar Chaudhary Law Firm, on behalf of Sigma Development Corporation, via its own bank account, tendered to the Defendants the total sum of $100,000.00, for the purpose of said Defendants to search and find investors for a real estate project that is being developed, outside of greater Houston, Texas.

14. In initial phone conferences with Defendants Epshteyn and Tammaro in the Fall of 2014 the project was discussed in much detail; in each of those discussions, the Plaintiff raised concerns regarding the potential difficulties of receiving sufficient funding for its project through the Defendants' efforts and sources. It was only upon numerous representations and repeated assurances that Defendants had made to the Plaintiff, regarding Defendants' background, qualifications, and the strong prospect that the project would be funded through Defendants' efforts, that the Plaintiff agreed to tender the total sum of $100,000.00 to the Defendants.

15. Plaintiff was informed that Epshteyn had received his legal education at Georgetown University Law Center in Washington, DC and that he was a finance attorney by profession, who maintained his law license in the state of New York.  Furthermore, Defendant Epshteyn informed the Plaintiff he is a very successful investment banker who is duly licensed and registered with FINRA.

16. He supported this assertion by referencing previous employments in the finance industry; especially, at Milbank, Tweed, Hadley and McCloy where, according to the Defendant, he was part of the Finance practice and worked on a wide range of securities transactions, including bank finance and private placements.

5

17. Moreover, Defendant Epshteyn boasted further that he was a so-called Republican political analyst or strategist and because he had worked as a communications aide with the McCain-Palin campaign, he carried a lot of clout within the party.  Defendant Epshteyn, suggested that the Plaintiff should Google him and watch his videos on YouTube.   Defendant claimed that he was a regular guest on MSNBC, CNN, CNBC, Fox News, and radio programs nationwide and provided analysis on topics including political strategy, financial markets, international affairs, future elections, and party relations.

18. Defendant Epshteyn told the Plaintiff that when the timing is right, Mr. James Tammaro, President/Chief Executive Officer of his firm, who supervised Defendant Epshteyn's action and who supposedly had decades of finance and investment banking experience with prominent firms, would step in.  In the words of Defendant Epshteyn, once Mr. Tammaro would get involved with the effort, funding of the project was a "done deal."

19. Immediately thereafter, Defendant Tammaro stepped in and together Defendants Epshteyn and Tammaro represented to the Plaintiff that they had the proper Securities licenses in order for them to conduct business in the State of Texas as well as with investors in New York area. They assured Plaintiff that they had all of the requisite credentials needed to secure funding in this real estate project that was going to be developed in the State of Texas.

20. Defendant Epshteyn via telephone conversations with Plaintiff, in an effort to reinforce certainty that the project would get funded, told the Plaintiff that since the he believed that the Plaintiff's project was so unique, because it was a mega theme park development in Houston, Texas, where there was no theme park like Florida and California's Disney Parks, he knew just the investors which would fund the Plaintiff's project.

6

21. Subsequent to the initial discussions, Defendant Epshteyn assured the Plaintiff over the phone, that the real estate project had been discussed with several investors and that these supposed investors were willing and able to provide financing for the project. Defendants Epshteyn and Tammaro went to great lengths to assure the Plaintiff that they would get the Plaintiff's project funded. To bolster his representations, Defendant Epshteyn assured the Plaintiff that he had already called upon his connections within the investment banking industry, including personal relationships with numerous investment banks, and activated his political clout to get the funding arranged. In addition, Defendants Epshteyn and Tammaro further boasted that they had just the right team, which had personal connections with commercial lenders, "family offices," fund managers and international investors, within his investment firm (TGP Securities, Inc.).

22. Defendant Epshteyn represented on numerous occasions that he took directions from James Tammaro, and that Mr. Tammaro's inputs and connections in the industry were extremely valuable to his efforts. Together, Defendants Epshteyn and Tammaro, during phone conferences, confirmed that they had already convinced very wealthy individual investors on the merits of this project. Therefore, they represented, that obtaining all necessary funding for the project was all but done, and it only needed Plaintiff's decision to pay the upfront fee and enter into a contractual relationship.

23. Based on the above-mentioned representations and similar claims made by the Defendants, Plaintiff's interest level in pursuing the funding of the project with the Defendants was greatly boosted and Plaintiff expressed confidence in relying on the Defendants. As soon as the Plaintiff expressed its interest and seriousness in engaging the Defendants, Mr. Epshteyn informed the Plaintiff he did not think that there would be any issues. Plaintiff agreed and

waited while Defendant Epshteyn discussed the project with his team in order to get their approval.

24. On or about 11/7/2014, the Defendant Epshteyn confirmed his team's approval to the Plaintiff via email.  Subsequently, on or about 11/8/2014, in a follow up email Defendant Epshteyn told the Plaintiff that there would be an upfront fee for his services, upwards of $200,000.00, and that he would also require a 4% success fee at the backend.

25. When the Plaintiff brought up his reservations with Defendant Epshteyn regarding these terms, Defendant's response was that these charges were routine for his services for raising similar amounts.  He further explained that the upfront fees were necessary for the "expenses" he was going to incur in order to get the project funded.  He also highlighted the fact that his sources had already committed to funding the entire project through debt and equity components and that the only costs Plaintiff had were his upfront fees.

26. Based on supposed background, reputation, and experience of the Defendants, as presented by Defendant Epstehyn regarding himself and Mr. Tammaro, and especially the specific representations regarding this project made by the Defendants Epshteyn and Tammaro, the Plaintiff believed that the Defendants had the full capacity and willingness to get the project funded.

27. As stated above, on or about 11/21/2014 and 12/19/2014, the Plaintiff Sigma Development Corporation tendered to the Defendants Epshteyn and Tammaro the total sum of $100,000.00 as payment for the services that Defendants promised to provide.

28. A proposed agreement was tendered by the Defendants Epshteyn and Tammaro for review and execution by the Plaintiff.  The Defendants fully executed and signed the agreement; however, Plaintiff did not sign or execute the written agreement, because the Plaintiff did not

8

find the representations made by the Defendants in the agreement that the funding was guaranteed. Accordingly, Plaintiff requested of the Defendants that the agreement be modified to reflect the representations, assurances and guarantees made regarding funding of the Plaintiff's project which prompted ongoing (back-and-forth) discussions.   These discussions involved Defendants asking for more money in order to make the previously discussed and agreed upon covenants a part of the contract and Plaintiff's insistence that no further payments would be made until the Defendants would agree to include the previously discussed covenants in the contract, as well as, concrete evidence of funding of Plaintiff's project.

29. In December of 2014, the Plaintiff inquired as to how things were progressing in terms of modifying the contract and obtaining investors.  Defendant Epshteyn responded that he had been working on securing funding for the project and that Madison Capital was ready and willing to fund the project, and also that a Texas company called Mission Capital also was ready and willing to fund the project.  Defendant's response, as far as modifying the contract to reflect what he had represented to the Plaintiff, was that the Plaintiff would have to make additional payments in order for the contract to be modified.

30. In late January or early February of 2015, the Plaintiff made several more inquires as to how things were progressing, yet there was an ongoing refusal on the part of the Defendants Epshteyn and Tammaro to further discuss the progress until additional payments were made by the Plaintiff to the Defendants.

31. Plaintiff's again pleaded with the Defendants Epshteyn and Tammaro that it had already been discussed and agreed between the parties that any further (future) payments, in addition to the $100,000.00 already paid to the Defendants, would be contingent upon concrete evidence

of funding of the project, such as: a letter of intent, term sheet or some other indication, such as a firm letter of commitment for financing of the project.

32. Plaintiff also expressed his concerns to the Defendants Epshteyn and Tammaro that: other than email, text and phone communication between the parties, Plaintiff had not seen any results.  More specifically, Plaintiff told the Defendants that they had not shown them any evidence of real and tangible efforts with lenders or investors, which could corroborate Defendants' representations and claims that they had contacted investors and had willing and able investors, with whom the project had been discussed and that these investors were committed to providing the funding needed for the project.

33. Plaintiff's suggestions that the two parties should meet in person to facilitate further business dealings were completely rebuffed by Defendant Epshteyn, who often gave the excuse of being too preoccupied.

34. Most importantly, Plaintiff expressed their grave concern as to what the $100,000.00 payment was being used for; especially, if the Defendants Epshteyn and Tammaro had shown no evidence of progress and that the Defendants could not possibly have spent $100,000.00 of Plaintiff's money on just phone calls to the investors.  In addition, Plaintiff suggested to the Defendants that a description of the services and costs, if provided to the Plaintiff, would be very useful in understanding where the $100,000.00 were spent, if the money, as claimed by the Defendants, had already been spent, and why the Defendants needed more money, in addition to the $100,000.00 already paid.  Therefore, a proper accounting statement would help allay any misunderstandings.

35. However, instead of addressing Plaintiff's concerns, to the Plaintiff's utter shock and disappointment, Defendants Epshteyn and Tammaro responded by reneging from ALL of

their previously made guarantees.   Despite the repeated and firm assurances and representations that they had arranged the funding for the project, Defendants were now suggesting to Plaintiff that there was no reason for Plaintiff to depend on the Defendants for the funding if further payments were not made to the Defendants and continued not providing any explanation of where and how the Plaintiff's $100,000.00 was spent.   Instead, after the Plaintiff refused to send them more money, it was suggested to the Plaintiff that they should pursue other avenues for funding of their project.

36. In response, Plaintiff's in a letter addressed to Mr. Epshteyn, asked:

> If you do not feel confident about the funding of our project then why should we pour more money down the drain?  More importantly, if you were never confident about funding of our project, you should not have taken our $100,000.00 upfront.  After all, the idea behind sending you these huge advance payments ($100,000.00) was to see some results—we have not seen any.

37. In that same letter sent to the Defendants, Plaintiff asked:

> In the Investment Banking Contract sent to us, you are suggesting that we agree to a 4% commission upon funding.  We are looking for a $100 million in funding—4% of that is 4 million dollars.  We fail to comprehend why TGPS would be more interested in an additional $50,000 upfront instead of the 4 million dollars at the back end.  Most lenders we have discussed our project with are telling us that no upfront payments are required—we would only be charged a percentage at funding.  If you were even remotely confident about collecting the 4% commission ($4 million dollars) at funding, you could not possibly be more interested in any additional upfront payments when we have already paid you $100,000.00.

38. Ultimately, in February of 2015, the Plaintiff contacted Madison Capital directly in order to find out whether the Defendants Epshteyn and Tammaro had truly spoken to this entity about the project and whether Madison Capital was interested in investing in this real estate development.  The response of Madison Capital was that it had no interest in such a project, and additionally, no one from TGP Securities, Inc. had contacted it about such a project.

39. After contacting Madison Capital, Plaintiff again requested that the money ($100,000.00) be returned to the Plaintiff by the Defendants, but the Defendants continued to refuse the return

the $100,000.00 and continued to claim that the money ($100,000.00) had already been spent.

## VI.     First Cause of Action - Conversion of Property

40. Plaintiff re-alleges and incorporates by reference the allegations contained in foregoing paragraphs.

41. The elements of a claim for conversion of personal property are: (1) The Plaintiff owned, possessed, or had the right of immediate possession of the property; (2) The Defendant wrongfully exercised dominion or control over the property to the exclusion of and inconsistent with the Plaintiff's rights; (3) The Plaintiff demanded return of the property; and (4) The Defendant failed to return it.  *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 (Tex.App.-San Antonio 1997, pet. denied).

42. A Plaintiff must prove damages before recovery is allowed for conversion. Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion.  *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex.1982).

43. Here, the measure of damages for conversion would be the fair market value of $100,000 in cash, wired to the Defendants.

44. Damages for conversion are limited to the amount necessary to compensate the plaintiff for the actual losses proximately caused by the defendant's conversion.  *Multi-Moto Corp. v. ITT Commercial Fin. Corp.*, 806 S.W.2d 560, 566 (Tex.App.-Dallas 1990, writ denied).

45. In this case, at a minimum, the amount necessary to compensate the Plaintiff for the actual losses proximately caused by the Defendants' (conversion) would be the $100,000 lost to the Defendants, because:

46. Defendants, and each one of them, engaged in conduct described above, directly or indirectly, in the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of Plaintiff to the exclusion of, or inconsistent with, the Plaintiff's rights.

    (1) Plaintiff, Sigma Development Corporation, owned, or had possession of the property ($100,000), or entitlement, or had the right to immediate possession of $100,000.00 (property), namely: two fifty thousand dollars each payments made to the Defendants.

    (2) Plaintiff, Sigma, instructed Azhar Chaudhary Law Firm to make these payments, on behalf of Sigma, to the Defendants.

    (3) However, the first payment made to the Defendants, before Sigma was formed, was made through Sitywalk, which was credited by the Defendants to Sigma, towards the new contract between Sigma and the Defendants, terms of which contract were still being negotiated.

    (4) The second payment of $50,000 was made after the Sitywalk contract was mutually voided by the parties.

    (5) This second payment was credited towards the new contract, which was still being negotiated by the parties.

    (6) Both payments of $50,000 each made to the Defendants were made on behalf of Sigma by Azhar Chaudhary Law Firm, PC and the ($100,000), ultimately, belonged to Sigma.

    (7) Defendants, wrongfully, unlawfully and without authorization assumed and exercised control over the Plaintiff's property ($100,000.00) to the exclusion of, or inconsistent with, the Plaintiff's rights as an owner.

13

(8)   Defendants were not authorized to receive the two payments of fifty thousand dollars each, made on behalf of Sigma, with moneys owned by Sigma, because the Defendants induced the Plaintiff to make these payments under false pretenses, assurances and guarantees that these payments were being made towards Defendants efforts to raise funding for the Plaintiff's project—as evident from the facts in section V, the Defendants never had any intentions of making any efforts to raise the fund, in fact, they engaged in an elaborate fraudulent scheme to deprive the Plaintiff of possession of the $100,000.

(9)   "Under Texas law, conversion is the wrongful exercise of dominion and control over another's property in violation of the property owner's rights." *ITT Commercial Fin. Corp. v. Bank of the W.*, 166 F.3d 295, 305 (5th Cir.1999) (citing *Amarillo Nat'l Bank v. Komatsu Zenoah Am., Inc.*, 991 F.2d 273, 274 (5th Cir.1993); *Tripp Vill. Joint Venture v. MBank Lincoln Ctr., N.A.*, 774 S.W.2d 746, 750 (Tex. App.—Dallas 1989, writ denied)); accord *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 410 (5th Cir.2004); *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir.2003); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 211 n. 44 (Tex.2002); *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex.1992).

(10)   Here, the Defendants wrongfully exercised dominion and control over the Plaintiff's property ($100,000), in violation of the Plaintiff's ownership rights, because the two payments of $50,000 each were made to the Defendants for a specific purpose, to raise funds for the Plaintiff's project, which the Defendants never had any intention to raise.

(11)     The clear, unequivocal, understanding given to the Plaintiff by the Defendants

was that the funds would be kept in safekeeping by the Defendants, indeed that the

Defendants would segregate those funds, as they were required to do, under the rules

promulgated by FINRA and NASD, regulations and standards Defendants were

subject to, as broker dealers, "TGP is a New York-based investment banking firm,

and Epshteyn and Tammaro are its principals.investments." **MTD ¶** 2(1),[1] term used

for the Defendants by their learned counsel to describing how Defendants made a

living, as so-called professionals.

(12)     "Texas jurisprudence holds that money can be the subject of conversion, but only

when it is in the form of specific chattel, such as old coins, or when the money is

delivered to another party for safekeeping, the keeper claims no title, and the money

is required and intended to be segregated, either substantially in the form in which it

was received or as an intact fund." *Mitchell Energy Corp. v. Samson Res. Co.*, 80

F.3d 976, 984 (5th Cir.1996) (quoting *Dixon v. State*, 808 S.W.2d 721, 723

(Tex.App.—Austin 1991, writ dism'd w.o.j.)); see *Phippen v. Deere & Co.*, 965

S.W.2d 713, 724 (Tex.App.—Texarkana 1998, no pet.); *Newsome v. Charter Bank

Colonial*, 940 S.W.2d 157, 161 (Tex.App.—Houston [14th Dist.] 1996, writ denied)

(citing *Estate of Townes v. Townes*, 867 S.W.2d 414, 419-20 (Tex. App.—Houston

[14th Dist.] 1993, writ denied)); *Edlund v. Bounds*, 842 S.W.2d 719, 727

(Tex.App.—Dallas 1992, writ denied).

(13)     In this case, the Defendants couldn't have claimed any title to the $100,000 of the

Plaintiff's money, because the Defendants were required to not claim any title to

those funds, because they hadn't done any work yet, as investments bankers, to earn

---

[1] [1] For readability, citations to the Motion to Dismiss are abbreviated "**MTD.**"

title to those funds.  Indeed, funds ($100,000) were delivered to the Defendants for safekeeping—the terms of the contract between Sigma and the Defendants were still being negotiated; resultantly, the Defendants couldn't possibly have had any ownership rights to those funds—the Defendants were required to segregate the two payments of $50,000 each, substantially in the form in which it was received, as an intact fund.

(14)    The Plaintiff claims that the under NASD and FINRA rules, the Defendants were required to keep an exact account of the funds transferred (for safekeeping) to the Defendants and that the funds should have been readily traceable—Defendants couldn't have and indeed shouldn't have comingled these funds.

(15)    As explained above, Plaintiff expressed their grave concern as to what the $100,000.00 payment was being used for; especially, if the Defendants Epshteyn and Tammaro had shown no evidence of progress and that the Defendants could not possibly have spent $100,000.00 of Plaintiff's money on just phone calls to the investors.  In addition, Plaintiff suggested to the Defendants that a description of the services and costs, if provided to the Plaintiff, would be very useful in understanding where the $100,000.00 were spent, if the money, as claimed by the Defendants, had already been spent, and why the Defendants needed more money, in addition to the $100,000.00 already paid.  Therefore, a proper accounting statement would help allay any misunderstandings.

(16)    However, no such accounting or explanation was ever provided by the Defendants. Ultimately, Plaintiff demanded return of the property ($100,000.00) from

the Defendants; and, yet, as explained above, (4) Defendants refused to, or failed to, return the property ($100,000).

## VII. Second Cause of Action - Negligent Misrepresentation

47. Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs. Defendants, and each one of them, engaged in conduct described above, directly or indirectly.

48. In order to prove negligent misrepresentation, a plaintiff must show that (1) the Defendants made a representation in the course of their business, or in a transaction in which they had a pecuniary interest; (2) the Defendants supplied "false information" for the guidance of Plaintiff in a business transaction (raising the funds for Plaintiff's project); (3) the Defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the Plaintiff suffered a pecuniary loss by justifiably relying on the representation made by the Defendants. *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n. 24 (Tex. 2002) (*citing Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

49. Plaintiff claims:

(1) Defendants provided information to the Plaintiff in the course of Defendants' business, or in a transaction in which the Defendants had a pecuniary interest;

(2) Defendants supplied false information to the Plaintiff;

(3) Defendants did not exercise reasonable care or competence in obtaining or communicating the information;

(4) Plaintiff justifiably relied on the representation made by the Defendants; and

(5) Plaintiff suffered damages proximately caused by relying on the information provided by Defendants, Defendants' negligent misrepresentation proximately caused Plaintiff's injury (loss of $100,000.00).

50. Further, Defendants' act of contemplating false information in making negligent misrepresentations to the Plaintiff was a misstatement of existing fact, not a promise of future conduct.

51. The Defendants made oral representations to  the Plaintiff including, but not limited to, the following untrue statements of material fact:

(1) That the Defendants had discussed the Plaintiff's project with numerous lenders in New York and Texas and investments banks, when the Defendants had made no such efforts.

(2) That the Defendants had arranged for funding through lenders he had prior interactions and relations with when in fact there were no lenders with whom the Defendants had made funding arrangements with.

(3) In initial phone conferences with Defendants Epshteyn and Tammaro in the Fall of 2014 the project was discussed in much detail; in each of those discussions, the Plaintiff raised concerns regarding the potential difficulties of receiving sufficient funding for its project through the Defendants' efforts and sources.   Defendants continued to represent that the funding for the project had been already discussed and arranged.

(4) It was only upon numerous representations and repeated assurances that Defendants had made to the Plaintiff, regarding Defendants' background, qualifications, and the strong prospect that the project would be funded through Defendants' efforts, that the

Plaintiff agreed to tender the total sum of $100,000.00 to the Defendants. Therefore, Defendants used their qualifications to manipulate Plaintiff into giving that money.

(5) Plaintiff was informed that Epshteyn had received his legal education at Georgetown University Law Center in Washington, DC and that he was a finance attorney by profession, who maintained his law license in the state of New York.  Furthermore, Defendant Epshteyn informed the Plaintiff he is a very successful investment banker who is duly licensed and registered with FINRA.

(6) Defendant Epshteyn knowingly and deliberately tried to build up his credibility and so-called reputation with the Plaintiff so that he could succeed in the confidence game of depriving the Plaintiff of a $100,000.

(7) In fact, the Defendants' scheme was to continue to siphon off funds, under the guise of deceptive representation that funding has been arranged for the Plaintiff's project, as the Defendants' repeatedly asked for more money from the Plaintiff.

(8) As an example, Epshteyn tried to support assertions that he was somewhat of a finance guru by referencing previous employments in the finance industry; especially, at Milbank, Tweed, Hadley and McCloy where, according to the Defendant, he was part of the Finance practice and worked on a wide range of securities transactions, including bank finance and private placements.

(9) Defendant Epshteyn told the Plaintiff that when the timing is right, Mr. James Tammaro, President/Chief Executive Officer of his firm, who supervised Defendant Epshteyn's action and who supposedly had decades of finance and investment banking experience with prominent firms, would step in.  In the words of Defendant

Epshteyn, once Mr. Tammaro would get involved with the effort, funding of the project was a "done deal."

(10)     Plaintiff relied on these assurances and tendered the $100,000 to Defendants, believing that substantial work was going to be done and the funding would be procured.

(11)     Immediately thereafter, Defendant Tammaro stepped in and together Defendants Epshteyn and Tammaro represented to the Plaintiff that they had the proper Securities licenses in order for them to conduct business in the State of Texas as well as with investors in New York area. They assured Plaintiff that they had all of the requisite credentials needed to secure funding in this real estate project that was going to be developed in the State of Texas.

(12)     Defendant Epshteyn via telephone conversations with Plaintiff, in an effort to reinforce certainty that the project would get funded, told the Plaintiff that since the he believed that the Plaintiff's project was so unique, because it was a mega theme park development in Houston, Texas, where there was no theme park like Florida and California's Disney Parks, he knew just the investors which would fund the Plaintiff's project.

(13)     Subsequent to the initial discussions, Defendant Epshteyn assured the Plaintiff over the phone, that the real estate project had been discussed with several investors and that these supposed investors were willing and able to provide financing for the project.   Defendants Epshteyn and Tammaro went to great lengths to assure the Plaintiff that they would get the Plaintiff's project funded.

(14)    To bolster his representations, Defendant Epshteyn assured the Plaintiff that he had already called upon his connections within the investment banking industry, including personal relationships with numerous investment banks, and activated his political clout to get the funding arranged.  In addition, Defendants Epshteyn and Tammaro further boasted that they had just the right team, which had personal connections with commercial lenders, "family offices," fund managers and international investors, within his investment firm (TGP Securities, Inc.).

(15)    Defendant Epshteyn represented on numerous occasions that he took directions from James Tammaro, and that Mr. Tammaro's inputs and connections in the industry were extremely valuable to his efforts. Together, Defendants Epshteyn and Tammaro, during phone conferences, confirmed that they had already convinced very wealthy individual investors on the merits of this project.  Therefore, they represented, that obtaining all necessary funding for the project was all but done, and it only needed Plaintiff's decision to pay the upfront fee and enter into a contractual relationship.

(16)    Based on the above-mentioned representations and similar claims made by the Defendants, Plaintiff's interest level in pursuing the funding of the project with the Defendants was greatly boosted and Plaintiff expressed confidence in relying on the Defendants.   As soon as the Plaintiff expressed its interest and seriousness in engaging the Defendants, Mr. Epshteyn informed the Plaintiff he did not think that there would be any issues. Plaintiff agreed and waited while Defendant Epshteyn discussed the project with his team in order to get their approval.

(17)    On or about 11/7/2014, the Defendant Epshteyn confirmed his team's approval to the Plaintiff via email.  Subsequently, on or about 11/8/2014, in a follow up email

Defendant Epshteyn told the Plaintiff that there would be an upfront fee for his services, upwards of $200,000.00, and that he would also require a 4% success fee at the backend.

(18)   When the Plaintiff brought up his reservations with Defendant Epshteyn regarding these terms, Defendant's response was that these charges were routine for his services for raising similar amounts.  He further explained that the upfront fees were necessary for the "expenses" he was going to incur in order to get the project funded.  He also highlighted the fact that his sources had already committed to funding the entire project through debt and equity components and that the only costs Plaintiff had were his upfront fees.

(19)   Based on supposed background, reputation, and experience of the Defendants, as presented by Defendant Epstehyn regarding himself and Mr. Tammaro, and especially the specific representations regarding this project made by the Defendants Epshteyn and Tammaro, the Plaintiff believed that the Defendants had the full capacity and willingness to get the project funded.

(20)   As stated above, on or about 11/21/2014 and 12/19/2014, the Plaintiff Sigma Development Corporation tendered to the Defendants Epshteyn and Tammaro the total sum of $100,000.00 as payment for the services that Defendants promised to provide.

(21)   A proposed agreement was tendered by the Defendants Epshteyn and Tammaro for review and execution by the Plaintiff.  The Defendants fully executed and signed the agreement; however, Plaintiff did not sign or execute the written agreement,

22

because the Plaintiff did not find the representations made by the Defendants in the agreement that the funding was guaranteed.

(22)   Accordingly, Plaintiff requested of the Defendants that the agreement be modified to reflect the representations, assurances and guarantees made regarding funding of the Plaintiff's project which prompted ongoing (back-and-forth) discussions.  These discussions involved Defendants asking for more money in order to make the previously discussed and agreed upon covenants a part of the contract and Plaintiff's insistence that no further payments would be made until the Defendants would agree to include the previously discussed covenants in the contract, as well as, concrete evidence of funding of Plaintiff's project.

(23)   In December of 2014, the Plaintiff inquired as to how things were progressing in terms of modifying the contract and obtaining investors.  Defendant Epshteyn responded that he had been working on securing funding for the project and that Madison Capital was ready and willing to fund the project, and also that a Texas company called "Mission Capital" also was ready and willing to fund the project. Defendant's response, as far as modifying the contract to reflect what he had represented to the Plaintiff, was that the Plaintiff would have to make additional payments in order for the contract to be modified.

(24)   In late January or early February of 2015, the Plaintiff made several more inquires as to how things were progressing, yet there was an ongoing refusal on the part of the Defendants Epshteyn and Tammaro to further discuss the progress until additional payments were made by the Plaintiff to the Defendants.

(25)   Plaintiff's again pleaded with the Defendants Epshteyn and Tammaro that it had already been discussed and agreed between the parties that any further (future) payments, in addition to the $100,000.00 already paid to the Defendants, would be contingent upon concrete evidence of funding of the project, such as: a letter of intent, term sheet or some other indication, such as a firm letter of commitment for financing of the project.

(26)   Plaintiff also expressed his concerns to the Defendants Epshteyn and Tammaro that: other than email, text and phone communication between the parties, Plaintiff had not seen any results.  More specifically, Plaintiff told the Defendants that they had not shown them any evidence of real and tangible efforts with lenders or investors, which could corroborate Defendants' representations and claims that they had contacted investors and had willing and able investors, with whom the project had been discussed and that these investors were committed to providing the funding needed for the project.

(27)   Plaintiff's suggestions that the two parties should meet in person to facilitate further business dealings were completely rebuffed by Defendant Epshteyn, who often gave the excuse of being too preoccupied.

(28)   Most importantly, Plaintiff expressed their grave concern as to what the $100,000.00 payment was being used for; especially, if the Defendants Epshteyn and Tammaro had shown no evidence of progress and that the Defendants could not possibly have spent $100,000.00 of Plaintiff's money on just phone calls to the investors.  In addition, Plaintiff suggested to the Defendants that a description of the services and costs, if provided to the Plaintiff, would be very useful in understanding

where the $100,000.00 were spent, if the money, as claimed by the Defendants, had already been spent, and why the Defendants needed more money, in addition to the $100,000.00 already paid.  Therefore, a proper accounting statement would help allay any misunderstandings.

(29)    However, instead of addressing Plaintiff's concerns, to the Plaintiff's utter shock and disappointment, Defendants Epshteyn and Tammaro responded by reneging from ALL of their previously made guarantees.

(30)    Despite the repeated and firm assurances and representations that they had arranged the funding for the project, Defendants were now suggesting to Plaintiff that there was no reason for Plaintiff to depend on the Defendants for the funding if further payments were not made to the Defendants and continued not providing any explanation of where and how the Plaintiff's $100,000.00 was spent.  Instead, after the Plaintiff refused to send them more money, it was suggested to the Plaintiff that they should pursue other avenues for funding of their project.

### VIII.    Third Cause of Action - Fraudulent Misrepresentation

52. To prevail in a cause of action for fraud, one must provide sufficient evidence of the elements of fraud, which are (1) a material misrepresentation was made; (2) it was false; (3) when the representation was made, the speaker knew it was false or the statement was recklessly asserted without any knowledge of its truth; (4) the speaker made the false representation with the intent that it be acted on by the other party; (5) the other party acted in reliance on the misrepresentation; and (6) the party suffered injury as a result. *Taylor Elec. Servs., Inc. v. Armstrong Elec. Supply Co.*, 167 S.W.3d 522, 526 (Tex. App.-Fort Worth

2005, no pet.) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)); see *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 921 (Tex. 2010).

53. Plaintiff alleges that material representations were false, e.g., all of the material statements made by the Defendants, referred to in Section V of this petition, were false.

54. Plaintiff alleges that when the Defendants made representations, Defendants knew they were false or made them recklessly without any knowledge of truth and as positive assertions, e.g. when the Defendants made the statements referred to in Section V of this petition, the Defendants either knew they were false or made them recklessly without any knowledge of the truth, and made them as positive assertions.

55. Plaintiff alleges that Defendants made representations with intent that they should be acted on by Plaintiff, e.g., the Defendants made the statements referred to in Section V with the intent of inducing the Plaintiff to enter the transaction referred to in Section V.

56. Plaintiff alleges that the Plaintiff acted in reliance on representations, e.g., Relying on the Defendants' statements referred to in Section V, the Plaintiff entered the transaction referred to in Section V, and the Plaintiff would not have entered the transaction but for the Defendants' statements.

57. A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).  While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. Id. Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made. Id. at 435. However, that fact is a circumstance to be considered with other facts to establish intent. Id.  Since intent to

defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. Id."Slight circumstantial evidence of fraud,' when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." Id. (quoting *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex. Civ. App.-El Paso 1951, orig. proceeding)).

58. Plaintiff alleges that it suffered injury, at the time of the Defendants' statements referred to in Section V and below, and at all subsequent times, continuing to the present, in that no funding had been arranged by the Defendants. This caused Plaintiff to have a pecuniary loss of $100,000.00.

59. Also, Plaintiff alleges that at the time of the Defendants' statements referred to in Section V and below and at all subsequent times, continuing to the present, the Defendants had not contacted any lenders or investment banks and the Defendants did not know anyone who was willing and able to finance the Plaintiff's project.

60. As a result of the Defendants' fraudulent misrepresentations, the Plaintiff has suffered damages in a sum within the jurisdictional limits of the court.  Along the same lines, the Plaintiff further claims that special or consequential damages were incurred as proximate result of reliance on Defendants' fraud, e.g. the economic loss sustained in the transaction described in Section V, is at least $100,000.00.

61. The Defendants made the false representations referred to in Section V with actual awareness of their falsity.  As a result, the Defendants are liable for exemplary damages.

62. In addition, the Plaintiff is entitled to an award of reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

63. More specifically:

64.  Subsequent to the initial discussions, as explained in section V in detail, Defendant Epshteyn assured the Plaintiff over the phone, that the real estate project had been discussed with several investors and that these supposed investors were willing and able to provide financing for the project.

65. Defendants Epshteyn and Tammaro went to great lengths to assure the Plaintiff that they would get the Plaintiff's project funded.  To bolster his representations, Defendant Epshteyn assured the Plaintiff that he had already called upon his connections within the investment banking industry, including personal relationships with numerous investment banks, and activated his political clout to get the funding arranged.

66. In addition, Defendants Epshteyn and Tammaro further boasted that they had just the right team, which had personal connections with commercial lenders, "family offices," fund managers and international investors, within his investment firm (TGP Securities, Inc.).

67. Defendant Epshteyn represented on numerous occasions that he took directions from James Tammaro, and that Mr. Tammaro's inputs and connections in the industry were extremely valuable to his efforts. Together, Defendants Epshteyn and Tammaro, during phone conferences, confirmed that they had already convinced very wealthy individual investors on the merits of this project.  Therefore, they represented, that obtaining all necessary funding for the project was all but done, and it only needed Plaintiff's decision to pay the upfront fee and enter into a contractual relationship.

68. Based on the above-mentioned representations and similar claims made by the Defendants, Plaintiff's interest level in pursuing the funding of the project with the Defendants was greatly boosted and Plaintiff expressed confidence in relying on the Defendants.

69. As soon as the Plaintiff expressed its interest and seriousness in engaging the Defendants, Mr. Epshteyn informed the Plaintiff he did not think that there would be any issues. Plaintiff agreed and waited while Defendant Epshteyn discussed the project with his team in order to get their approval.

70. On or about 11/7/2014, the Defendant Epshteyn confirmed his team's approval to the Plaintiff via email.  Subsequently, on or about 11/8/2014, in a follow up email Defendant Epshteyn told the Plaintiff that there would be an upfront fee for his services, upwards of $200,000.00, and that he would also require a 4% success fee at the backend.

71. When the Plaintiff brought up his reservations with Defendant Epshteyn regarding these terms, Defendant's response was that these charges were routine for his services for raising similar amounts.  He further explained that the upfront fees were necessary for the "expenses" he was going to incur in order to get the project funded.  He also highlighted the fact that his sources had already committed to funding the entire project through debt and equity components and that the only costs Plaintiff had were his upfront fees.

72. Based on supposed background, reputation, and experience of the Defendants, as presented by Defendant Epstehyn regarding himself and Mr. Tammaro, and especially the specific representations regarding this project made by the Defendants Epshteyn and Tammaro, the Plaintiff believed that the Defendants had the full capacity and willingness to get the project funded.

73. As stated above, on or about 11/21/2014 and 12/19/2014, the Plaintiff Sigma Development Corporation tendered to the Defendants Epshteyn and Tammaro the total sum of $100,000.00 as payment for the services that Defendants claimed had already been provided, because the Defendants claimed that the funding for the Plaintiff's project had already been arranged.

### IX.    Fourth Cause of Action - Violations of Deceptive Trade Practices Act of the Texas Business & Commerce Code

74. Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs. Defendants, and each one of them, engaged in conduct described above, directly or indirectly.

75. Plaintiff claims:

   a. the Plaintiff is a consumer as defined by the Texas Deceptive Trade Practices Act ("DTPA") and the DTPA is a protector for businesses, such as Sigma, making large transactions;

   b. Defendants can be sued under the DTPA,

   c. Defendants committed a wrongful act under the DTPA, and

   d.  Defendants' actions were a producing cause of the Plaintiff's damages.

76. The representations violate subdivisions of Section 17.46 of the Deceptive Trade Practices Act in that they constitute representations that particular goods and services have certain qualities, uses or benefits when they did not and failing to disclose information about goods or services with the intent to induce Plaintiff to enter into a transaction that Plaintiff would not have entered into if the information had been disclosed.

77. Plaintiff claims that each Defendant violated a specific provision of the Act, and that the violation was a producing cause of the Plaintiff's injury.

78. Plaintiff further alleges that:

79. Defendants failed to disclose material information;

80. Defendants had knowledge of this material information at the time of the transaction;

81. Defendants, through knowledge of this material information, which the Defendants failed to disclose, intended to induce the Plaintiff into the supposed funding of the project transaction; and

82. that Plaintiff otherwise would not have entered the transaction if the information had been disclosed.

83. Subsequent to the initial discussions, Defendant Epshteyn assured the Plaintiff over the phone, that the real estate project had been discussed with several investors and that these supposed investors were willing and able to provide financing for the project.  Defendants Epshteyn and Tammaro went to great lengths to assure the Plaintiff that they would get the Plaintiff's project funded.

84. To bolster his representations, Defendant Epshteyn assured the Plaintiff that he had already called upon his connections within the investment banking industry, including personal relationships with numerous investment banks, and activated his political clout to get the funding arranged.  In addition, Defendants Epshteyn and Tammaro further boasted that they had just the right team, which had personal connections with commercial lenders, "family offices," fund managers and international investors, within his investment firm (TGP Securities, Inc.).

85. Defendant Epshteyn represented on numerous occasions that he took directions from James Tammaro, and that Mr. Tammaro's inputs and connections in the industry were extremely valuable to his efforts. Together, Defendants Epshteyn and Tammaro, during phone conferences, confirmed that they had already convinced very wealthy individual investors on the merits of this project.  Therefore, they represented, that obtaining all necessary funding

for the project was all but done, and it only needed Plaintiff's decision to pay the upfront fee and enter into a contractual relationship.

86. Based on the above-mentioned representations and similar claims made by the Defendants, Plaintiff's interest level in pursuing the funding of the project with the Defendants was greatly boosted and Plaintiff expressed confidence in relying on the Defendants.  As soon as the Plaintiff expressed its interest and seriousness in engaging the Defendants, Mr. Epshteyn informed the Plaintiff he did not think that there would be any issues. Plaintiff agreed and waited while Defendant Epshteyn discussed the project with his team in order to get their approval.

87. On or about 11/7/2014, the Defendant Epshteyn confirmed his team's approval to the Plaintiff via email.  Subsequently, on or about 11/8/2014, in a follow up email Defendant Epshteyn told the Plaintiff that there would be an upfront fee for his services, upwards of $200,000.00, and that he would also require a 4% success fee at the backend.

88. When the Plaintiff brought up his reservations with Defendant Epshteyn regarding these terms, Defendant's response was that these charges were routine for his services for raising similar amounts.  He further explained that the upfront fees were necessary for the "expenses" he was going to incur in order to get the project funded.  He also highlighted the fact that his sources had already committed to funding the entire project through debt and equity components and that the only costs Plaintiff had were his upfront fees.

89. Based on supposed background, reputation, and experience of the Defendants, as presented by Defendant Epstehyn regarding himself and Mr. Tammaro, and especially the specific representations regarding this project made by the Defendants Epshteyn and Tammaro, the

Plaintiff believed that the Defendants had the full capacity and willingness to get the project funded.

90. As stated above, on or about 11/21/2014 and 12/19/2014, the Plaintiff Sigma Development Corporation tendered to the Defendants Epshteyn and Tammaro the total sum of $100,000.00 as payment for the services that Defendants promised to provide.

91. Defendants' representations, including those as described in this petition, were false, misleading and deceptive in that Defendants represented to Plaintiff that Defendants had arranged for the funding of the Plaintiff's project.

92. In addition, Defendants obtained the payment of $100,000.00 by designing and executing a scheme that induced Plaintiff into engaging and paying the Defendants for fraudulent services which the Defendants never had the capacity, resources, intentions or willingness to provide to the Plaintiff.

93. The purpose behind Defendants misleading and deceptive representations was to induce Plaintiff into making the initial $100,000.00 payments as well as further payments of at least $100,000.00 for services which the Defendants never intended to provide.

94. Defendants misrepresented to the Plaintiff that the funding for the project had already been arranged and that as soon as the Plaintiff were to make further payments to the Defendants, in addition to $100,000.00 already paid, the Plaintiff's project would be funded.

95. Defendants engaged in an unconscionable course of action by falsely representing to Plaintiff that Plaintiff's project would be funded. By such conduct, Defendants took advantage of Plaintiff's desire to have the Plaintiff's project funded to a grossly unfair degree. Plaintiff relied upon Defendants' false and/or misleading representations to their detriment.

96. Defendants' conduct as described above was a producing cause of Plaintiff's economic damages. As a result of Defendants' conduct, Plaintiff has suffered economic damages within the jurisdictional limits of this court.

97. Defendants' conduct described above was committed knowingly and intentionally. Defendants were actually aware, at the time of the conduct of the falsity, deception, and unfairness of the conduct about which Plaintiff complains.

98. As a direct result of Defendants' knowing and intentional misconduct, Plaintiff suffered mental anguish. In particular, Plaintiff suffered depression, intense feelings of humiliation, and belittlement, an abnormal sense of inferiority and accompanying panic attacks, as well as the loss of appetite and sleep.

99. More specifically:

(1) made material representations to the Plaintiff. Defendants' representations that funding was a "done deal" and that Defendants had lined up a number of solid funding sources was material to the success of the business venture Plaintiffs required funding for;

(2) representations made by Defendants were false. The material representations, regarding the status of the funding through a number of allegedly "solid sources" made by Defendants' were false, because when the Plaintiff inquired, by placing a phone call to Madison Capital, as to the status of funding progress with Madison Capital for Plaintiff's project, the Plaintiff was informed that the Defendants' had made no contacts with Madison Capital regarding the funding of the Plaintiff's project. In fact, Plaintiff was advised that Madison Capital hadn't even heard of the Defendants. In addition, Madison Capital explained to the Plaintiff that the

way it was set up regarding potential projects they might be interested in, Texas did not fall within that model—they were mainly interested in local New York City business ventures;

(3) when the Defendants made representation to Plaintiff, the Defendants knew they were making false representations and made these representations recklessly without any knowledge of the truth and Defendants made these representation as a positive assertion, because when the Defendants claimed, on behalf of Madison Capital that they were interested in Plaintiff's project, they never bothered to research or inquire with Madison Capital whether they would even be interested in a project located outside of New York City—all they had to do was call Madison Capital, or research the ongoing projects Madison Capital was involved in to see whether they are an entity which funds projects located in the Southern Unites States;

(4) Defendants made these representations with the intent that the Plaintiff should act upon these representations, Defendants did so because they wanted the Plaintiff to get even deeper involved with their project; specifically, with the purchase of the land parcels, so that the Plaintiff would feel pressured to continue to make additional payments to the Defendants, in hopes of getting the project funded; especially, because of increasing difficulties to walk away from the project, since the Plaintiff would have been committed to purchasing the land parcels;

(5) Plaintiff acted in reliance on the representations made by the Defendants, because based on the representations made by the Defendants, Plaintiff continued to spend

time and funds on the project, feeling confident due to the representations made by the Defendants that the project's funding was a "done deal;"

(6) Plaintiff suffered injury as a result, because Plaintiff lost a hundred thousand dollars to the Defendants and suffered addition financial losses due to the failure of the project Plaintiff had spent time and money on.

(7) That the Defendants had discussed the Plaintiff's project with numerous lenders in New York and Texas and investments banks, when the Defendants had made no such efforts.

(8) That the Defendants had arranged for funding through lenders he had prior interactions and relations with when in fact there were no lenders with whom the Defendants had made funding arrangements with.

(9) In initial phone conferences with Defendants Epshteyn and Tammaro in the Fall of 2014 the project was discussed in much detail; in each of those discussions, the Plaintiff raised concerns regarding the potential difficulties of receiving sufficient funding for its project through the Defendants' efforts and sources.

100.    Accordingly, Defendants are liable to Plaintiff for mental anguish damages and additional damages of up to three times the amount of economic damages as permitted by the Deceptive Trade Practices Act.

## X.    <u>Sixth Cause of Action - Common Law Fraud</u>

101.    Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs. Defendants, and each one of them, engaged in conduct described above, directly or indirectly.

102.   "Fraud is the successful employment of cunning, deception or artifice to circumvent, cheat, or defraud another to his or her injury." *International Life Ins. Co. v. Herbert*, 334 S.W. 2d 525, 530 (Tex. Civ. App. -Waco 1960, writ ref'd., n.r.e.).

103.   A misrepresentation made knowingly or recklessly concerning a material fact, which is communicated with the intention of inducing a party to rely on it, and which is, in fact, relied on by that party to his or her detriment or injury, is fraudulent. *See Stone v. Lawyer's Title Ins. Corp*., 554 S. W. 2d 183, 185 (Tex. 1977); *Oil Well Division, US. Steel Corp. v. Fryer*, 493 S.W. 2d 487, 491 (Tex. 1973); *Custom Leasing v. Texas Bank & Trust Co. of Dallas*, 516 S.W. 2d 138, 142-143 (Tex. 1974).

104.   "A false representation of a past or present material fact, when one has a duty to speak the truth, is, of course, a frequent ground for recovery in fraud when another relies thereon to his detriment." *Chien v. Chen*, 759 S.W.2d 484, 494-95 (Tex. App. - Austin 1988, no writ). Fraud is also accomplished from artifice and concealment, such as indirect or misleading language, which induces another person to rely on false information to the person's detriment or injury. *Campbell v. Booth*, 526 S.W. 2d 167, 169 (Tex. Civ. App. - Dallas 1975, writ ref'd., n.r.e.). Circumstantial evidence of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent. *Columbia/HCA Healthcare Corp. v. Cottey*, 72 S.W. 3d 735,745 (Tex. App. -Waco 2002, no pet. h.).

105.   "Common law fraud includes both 'actual' and 'constructive fraud." *Chien v. Chen*, 759 S. W.2d 484, 494-95. Generally, common law fraud consists of the following elements: (1) a material misrepresentation was made; (2) it was false; (3) when the representation was made, the defendant knew it was false or such representation was made recklessly without any knowledge of its truth and as a positive assertion; (4) the defendant made the representation

with the intent that it should be acted upon by the Plaintiff; (5) the Plaintiff acted in reliance on the representation; and (6) the Plaintiff thereby suffered injury. *De Santis v. Wachenhut Corp.*, 793 S.W. 2d 670, 688 (Tex. 1990); *Stone v. Lawyer's Title Ins. Corp.*, 554 S.W. 2d 183, 185 (Tex. 1977).

106. Common law fraud encompasses outright falsities, as well as material omissions and half-truths. In a situation "where a person voluntarily discloses information, he must disclose the whole truth." *Newby v. Enron Corp.* 540 F. Supp. 759, 771 (S.D. Tex. 2007). *See also Hendricks v. Thorton Int'l*, 973 S. W.2d 348, 363 (Tex. App. - Beaumont, 1998); *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (observing that a "non-disclosure may be as misleading as a positive misrepresentation of facts"). "The maker of a false representation need not, in every instance, know it is false for the statement to form the basis for actionable fraud." *Wright v. Carpenter*, 579 S. W.2d 575,579 (Tex. Civ. App. 1979, writ denied). "[R]escission has long been a remedy for common law fraud." *Sandefer*, 58 S. W. 3d 760, 773 (Tex. Civ. App. - Houston [1st Dist.] 2001), quoting *Adickes v. Andreali*, 600 S. W. 2d 939, 945-47 (Tex. Civ. App. - Houston [1st Dist.] 1980, writ dism'd).

107. Plaintiff alleges that Defendants:

> (1) made material representations to the Plaintiff. Defendants' representations that funding was a "done deal" and that Defendants had lined up a number of solid funding sources was material to the success of the business venture Plaintiffs required funding for;

> (2) representations made by Defendants were false. The material representations, regarding the status of the funding through a number of allegedly "solid sources"

made by Defendants' were false, because when the Plaintiff inquired, by placing a phone call to Madison Capital, as to the status of funding progress with Madison Capital for Plaintiff's project, the Plaintiff was informed that the Defendants' had made no contacts with Madison Capital regarding the funding of the Plaintiff's project.  In fact, Plaintiff was advised that Madison Capital hadn't even heard of the Defendants.  In addition, Madison Capital explained to the Plaintiff that the way it was set up regarding potential projects they might be interested in, Texas did not fall within that model—they were mainly interested in local New York City business ventures;

(3) when the Defendants made representation to Plaintiff, the Defendants knew they were making false representations and made these representations recklessly without any knowledge of the truth and Defendants made these representation as a positive assertion, because when the Defendants claimed, on behalf of Madison Capital that they were interested in Plaintiff's project, they never bothered to research or inquire with Madison Capital whether they would even be interested in a project located outside of New York City—all they had to do was call Madison Capital, or research the ongoing projects Madison Capital was involved in to see whether they are an entity which funds projects located in the Southern Unites States;

(4) Defendants made these representations with the intent that the Plaintiff should act upon these representations, Defendants did so because they wanted the Plaintiff to get even deeper involved with their project; specifically, with the purchase of the land parcels, so that the Plaintiff would feel pressured to continue to make

additional payments to the Defendants, in hopes of getting the project funded; especially, because of increasing difficulties to walk away from the project, since the Plaintiff would have been committed to purchasing the land parcels;

(5) Plaintiff acted in reliance on the representations made by the Defendants, because based on the representations made by the Defendants, Plaintiff continued to spend time and funds on the project, feeling confident due to the representations made by the Defendants that the project's funding was a "done deal;"

(6) Plaintiff suffered injury as a result, because Plaintiff lost a hundred thousand dollars to the Defendants and suffered addition financial losses due to the failure of the project Plaintiff had spent time and money on.

(7) That the Defendants had discussed the Plaintiff's project with numerous lenders in New York and Texas and investments banks, when the Defendants had made no such efforts.

(8) That the Defendants had arranged for funding through lenders he had prior interactions and relations with when in fact there were no lenders with whom the Defendants had made funding arrangements with.

(9) In initial phone conferences with Defendants Epshteyn and Tammaro in the Fall of 2014 the project was discussed in much detail; in each of those discussions, the Plaintiff raised concerns regarding the potential difficulties of receiving sufficient funding for its project through the Defendants' efforts and sources.

## XI.    Seventh Cause of Action–Fraudulent Inducement

108.    Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs. Defendants, and each one of them, engaged in conduct described above, directly or indirectly.

109.    Plaintiff claims that:

(1) that Defendants made material misrepresentations;

(2) that Defendants knew to be false when they were made, or that Defendants made them recklessly without any knowledge of their truth and as a positive assertion;

(3) with the intent that Plaintiff would act upon it, and

(4) that Plaintiff acted in reliance on the misrepresentation, and

(5) Plaintiff suffered injury thereby. That the Defendants had discussed the Plaintiff's project with numerous lenders in New York and Texas and investments banks, when the Defendants had made no such efforts.

(6) That the Defendants had arranged for funding through lenders he had prior interactions and relations with when in fact there were no lenders with whom the Defendants had made funding arrangements with.

(7) In initial phone conferences with Defendants Epshteyn and Tammaro in the Fall of 2014 the project was discussed in much detail; in each of those discussions, the Plaintiff raised concerns regarding the potential difficulties of receiving sufficient funding for its project through the Defendants' efforts and sources.

(8) It was only upon numerous representations and repeated assurances that Defendants had made to the Plaintiff, regarding Defendants' background, qualifications, and the strong prospect that the project would be funded through

Defendants' efforts, that the Plaintiff agreed to tender the total sum of $100,000.00 to the Defendants.

(9) Defendants were not authorized to receive the two payments of fifty thousand dollars each, made on behalf of Sigma, with moneys owned by Sigma, because the Defendants induced the Plaintiff to make these payments under false pretenses, assurances and guarantees that these payments were being made towards Defendants efforts to raise funding for the Plaintiff's project—as evident from the facts in section V, the Defendants never had any intentions of making any efforts to raise the fund, in fact, they engaged in an elaborate fraudulent scheme to deprive the Plaintiff of possession of the $100,000.

(10)    Defendant Epshteyn told the Plaintiff that when the timing is right, Mr. James Tammaro, President/Chief Executive Officer of his firm, who supervised Defendant Epshteyn's action and who supposedly had decades of finance and investment banking experience with prominent firms, would step in.  In the words of Defendant Epshteyn, once Mr. Tammaro would get involved with the effort, funding of the project was a "done deal."

(11)    Defendant Epshteyn via telephone conversations with Plaintiff, in an effort to reinforce certainty that the project would get funded, told the Plaintiff that since the he believed that the Plaintiff's project was so unique, because it was a mega theme park development in Houston, Texas, where there was no theme park like Florida and California's Disney Parks, he knew just the investors which would fund the Plaintiff's project.

(12)     Subsequent to the initial discussions, Defendant Epshteyn assured the Plaintiff over the phone, that the real estate project had been discussed with several investors and that these supposed investors were willing and able to provide financing for the project.  Defendants Epshteyn and Tammaro went to great lengths to assure the Plaintiff that they would get the Plaintiff's project funded.  To bolster his representations, Defendant Epshteyn assured the Plaintiff that he had already called upon his connections within the investment banking industry, including personal relationships with numerous investment banks, and activated his political clout to get the funding arranged.  In addition, Defendants Epshteyn and Tammaro further boasted that they had just the right team, which had personal connections with commercial lenders, "family offices," fund managers and international investors, within his investment firm (TGP Securities, Inc.).

(13)     Based on the above-mentioned representations and similar claims made by the Defendants, Plaintiff's interest level in pursuing the funding of the project with the Defendants was greatly boosted and Plaintiff expressed confidence in relying on the Defendants.  As soon as the Plaintiff expressed its interest and seriousness in engaging the Defendants, Mr. Epshteyn informed the Plaintiff he did not think that there would be any issues. Plaintiff agreed and waited while Defendant Epshteyn discussed the project with his team in order to get their approval.

(14)     On or about 11/7/2014, the Defendant Epshteyn confirmed his team's approval to the Plaintiff via email.  Subsequently, on or about 11/8/2014, in a follow up email Defendant Epshteyn told the Plaintiff that there would be an

upfront fee for his services, upwards of $200,000.00, and that he would also require a 4% success fee at the backend.

(15)    When the Plaintiff brought up his reservations with Defendant Epshteyn regarding these terms, Defendant's response was that these charges were routine for his services for raising similar amounts.  He further explained that the upfront fees were necessary for the "expenses" he was going to incur in order to get the project funded.  He also highlighted the fact that his sources had already committed to funding the entire project through debt and equity components and that the only costs Plaintiff had were his upfront fees.

(16)    Based on supposed background, reputation, and experience of the Defendants, as presented by Defendant Epstehyn regarding himself and Mr. Tammaro, and especially the specific representations regarding this project made by the Defendants Epshteyn and Tammaro, the Plaintiff believed that the Defendants had the full capacity and willingness to get the project funded.

(17)    A proposed agreement was tendered by the Defendants Epshteyn and Tammaro for review and execution by the Plaintiff.   The Defendants fully executed and signed the agreement; however, Plaintiff did not sign or execute the written agreement, because the Plaintiff did not find the representations made by the Defendants in the agreement that the funding was guaranteed. Accordingly, Plaintiff requested of the Defendants that the agreement be modified to reflect the representations, assurances and guarantees made regarding funding of the Plaintiff's project which prompted ongoing (back-and-forth) discussions.  These discussions involved Defendants asking for more money in order to make the

previously discussed and agreed upon covenants a part of the contract and Plaintiff's insistence that no further payments would be made until the Defendants would agree to include the previously discussed covenants in the contract, as well as, concrete evidence of funding of Plaintiff's project.

(18)    In December of 2014, the Plaintiff inquired as to how things were progressing in terms of modifying the contract and obtaining investors. Defendant Epshteyn responded that he had been working on securing funding for the project and that Madison Capital was ready and willing to fund the project, and also that a Texas company called Mission Capital also was ready and willing to fund the project.  Defendant's response, as far as modifying the contract to reflect what he had represented to the Plaintiff, was that the Plaintiff would have to make additional payments in order for the contract to be modified.

(19)    In late January or early February of 2015, the Plaintiff made several more inquires as to how things were progressing, yet there was an ongoing refusal on the part of the Defendants Epshteyn and Tammaro to further discuss the progress until additional payments were made by the Plaintiff to the Defendants.

(20)    Plaintiff also expressed his concerns to the Defendants Epshteyn and Tammaro that: other than email, text and phone communication between the parties, Plaintiff had not seen any results.  More specifically, Plaintiff told the Defendants that they had not shown them any evidence of real and tangible efforts with lenders or investors, which could corroborate Defendants' representations and claims that they had contacted investors and had willing and able investors,

with whom the project had been discussed and that these investors were committed to providing the funding needed for the project.

(21)     Most importantly, Plaintiff expressed their grave concern as to what the $100,000.00 payment was being used for; especially, if the Defendants Epshteyn and Tammaro had shown no evidence of progress and that the Defendants could not possibly have spent $100,000.00 of Plaintiff's money on just phone calls to the investors.  In addition, Plaintiff suggested to the Defendants that a description of the services and costs, if provided to the Plaintiff, would be very useful in understanding where the $100,000.00 were spent, if the money, as claimed by the Defendants, had already been spent, and why the Defendants needed more money, in addition to the $100,000.00 already paid.   Therefore, a proper accounting statement would help allay any misunderstandings.

(22)     However, instead of addressing Plaintiff's concerns, to the Plaintiff's utter shock and disappointment, Defendants Epshteyn and Tammaro responded by reneging from ALL of their previously made guarantees.  Despite the repeated and firm assurances and representations that they had arranged the funding for the project, Defendants were now suggesting to Plaintiff that there was no reason for Plaintiff to depend on the Defendants for the funding if further payments were not made to the Defendants and continued not providing any explanation of where and how the Plaintiff's $100,000.00 was spent.  Instead, after the Plaintiff refused to send them more money, it was suggested to the Plaintiff that they should pursue other avenues for funding of their project.

**XII.     Eighth Cause of Action - Breach of Fiduciary Relationship**

110.   Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs. Defendants, and each one of them, engaged in conduct described above, directly or indirectly.

111.   Plaintiff alleges that:

(1) fiduciary duty relationship existed between the Plaintiff and Defendants;

(2) Defendants breached this duty owed to the Plaintiff; and

(3) breach resulted in injury to the Plaintiff and benefit to the Defendants.

(4) Defendants Epshteyn and Tammaro acted on behalf of TGP, however, they also acted in their individual capacities as well. Under the Financial Industry Regulatory Authority ("FINRA"), Defendants owed a fiduciary responsibility to their client Sigma and when Sigma asked for an accounting they refused to offer an accounting and cited their "countless discussions" as "results,"

(5) Furthermore, Defendant Epshteyn told Plaintiff that they should seek funding elsewhere, resorting to a tactic of threat.

(6) Defendants were not working in the best interests of their client, Sigma, breaching the fiduciary duty they owed to Plaintiff. Furthermore, Defendants acted ultra vires when they refused to give Plaintiff an accounting of what they had spent the money they had paid on.

(7) Furthermore, Plaintiffs in good faith entrusted the large sum of $100,000 for Defendants to procure results with regard to the investment banking, but the $100,000 was apparently utilized for phone calls and emails, and to no avail for procuring funds. This $100,000 advance payment was not unconditional.

## CAUSES OF ACTION ARISING UNDER TEXAS SECURITIES ACT

112.   Texas courts have frequently looked to federal courts for guidance on the interpretation of the term "security." *See Caldwell v. State*, 95 S.W.3d 563, 566. On a federal level, the U.S. Supreme Court has made it clear that "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called" (emphasis in original). *SEC v. Edwards*, 540 U.S. 389, 393 (2004), quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). With an eye toward achieving that objective, Congress "enacted a broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment.'" *Id.* As such, it is essential that the securities laws be applied so as to allow for the "economic realities" to take precedence over matters of form. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848 (1975).

### XIII.   Ninth Cause of Action - Offer and Sale of Securities by an Unregistered Broker or Dealer Violation of §12(A) of the TSA

113.   Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs.

114.   Section 12A of the Texas Securities Act imposes registration requirements upon agents who work on behalf of dealers, as well as dealers which employ such agents.  The segment of Section 12A that imposes a registration requirement on agents provides as follows: "No agent shall, in behalf of any dealer, sell, offer for sale, or make sale of any securities within the state unless registered as an agent for that particular registered dealer under the provisions of the Texas Securities Act." With respect to dealers, the pertinent language specifies that, in the, absence of an exemption, "no…dealer shall, directly or through agents, offer for sale, sell or make a sale of any securities in this state without first being registered as in this Act provided." Tex. Rev. Civ. Stat. Ann. Art. 581-12A.

115.    "Texas has a strong interest in regulating the sale of securities in and from the state." *Citizens Ins. Co. of Am. v. Daccah*, 217 S.W.3d 430, 440 (Tex. 2007).   The registration requirements embodied within Section 12 "indemnify investors victimized by violations of the Texas Securities Act, encourages compliance with its regulatory and disclosure provisions, creates an incentive for its private enforcement, and guards the integrity of the state's securities industry by protecting resident sellers who operate in compliance with the law." *Id.*

116.    During the time period in which Defendants Epshteyn and Tammaro attempted to induce the purchase and sale of securities to Plaintiff, Defendants Epshteyn and Tammaro were not registered as agents with the Texas State Securities Board; and they did not effect the attempted sale of those securities on behalf of any dealer which was so registered.   In that regard, TGP Securities, Inc. was not registered as a dealer with the Texas State Securities Board. Consequently, the conduct in which Defendants Epshteyn and Tammaro engaged, wherein they attempted to induce the purchase and sale of securities to Plaintiff, violated Section 12 of the Texas Securities Act.

117.    Recognizing that Defendants Epshteyn and Tammaro effected the inducement of sales and purchases of securities to the Plaintiff even though they were not acting on behalf of a registered dealer, and notwithstanding their failure to register as an agent under the Texas Securities Act; and even though TGP Securities, Inc. was not then registered with the Texas Securities Board, Defendants Epshteyn and Tammaro are liable to the Plaintiff under Section 33A(1) of the Texas Securities Act.   As set forth in that provision, "[a] person who offers or sells a security in violation of Section … 12 … of this Act is liable to the person buying the

security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." Tex. Rev. Civ. Stat. Ann. Art. 581-33(A)(1)

## XIV.     Tenth Cause of Action–Disgorgement

118.    Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs. Defendants, and each one of them, engaged in conduct described above, directly or indirectly.

119.    Black's Law Dictionary defines disgorgement as "The act of giving up something (such as profits illegally obtained) on demand or by legal compulsion."

120.    Defendants illegally obtained $100,000.00 from Plaintiff through manipulative tactics which induced Plaintiff to tender the payments.

121.    Because Defendants did not produce any substantial results and merely took the $100,000.00 under the guise of procuring funds, they must give Plaintiff the money back.

122.    Defendants were not authorized to receive the two payments of fifty thousand dollars each, made on behalf of Sigma, with moneys owned by Sigma, because the Defendants induced the Plaintiff to make these payments under false pretenses, assurances and guarantees that these payments were being made towards Defendants efforts to raise funding for the Plaintiff's project—as evident from the facts in section V, the Defendants never had any intentions of making any efforts to raise the fund, in fact, they engaged in an elaborate fraudulent scheme to deprive the Plaintiff of possession of the $100,000.

123.    Plaintiff alleges that Defendants:

(1) made material representations to the Plaintiff.  Defendants' representations that funding was a "done deal" and that Defendants had lined up a number of solid

funding sources was material to the success of the business venture Plaintiffs required funding for;

(2) representations made by Defendants were false.  The material representations, regarding the status of the funding through a number of allegedly "solid sources" made by Defendants' were false, because when the Plaintiff inquired, by placing a phone call to Madison Capital, as to the status of funding progress with Madison Capital for Plaintiff's project, the Plaintiff was informed that the Defendants' had made no contacts with Madison Capital regarding the funding of the Plaintiff's project.  In fact, Plaintiff was advised that Madison Capital hadn't even heard of the Defendants.  In addition, Madison Capital explained to the Plaintiff that the way it was set up regarding potential projects they might be interested in, Texas did not fall within that model—they were mainly interested in local New York City business ventures;

(3) when the Defendants made representation to Plaintiff, the Defendants knew they were making false representations and made these representations recklessly without any knowledge of the truth and Defendants made these representation as a positive assertion, because when the Defendants claimed, on behalf of Madison Capital that they were interested in Plaintiff's project, they never bothered to research or inquire with Madison Capital whether they would even be interested in a project located outside of New York City—all they had to do was call Madison Capital, or research the ongoing projects Madison Capital was involved in to see whether they are an entity which funds projects located in the Southern Unites States;

(4) Defendants made these representations with the intent that the Plaintiff should act upon these representations, Defendants did so because they wanted the Plaintiff to get even deeper involved with their project; specifically, with the purchase of the land parcels, so that the Plaintiff would feel pressured to continue to make additional payments to the Defendants, in hopes of getting the project funded; especially, because of increasing difficulties to walk away from the project, since the Plaintiff would have been committed to purchasing the land parcels;

(5) Plaintiff acted in reliance on the representations made by the Defendants, because based on the representations made by the Defendants, Plaintiff continued to spend time and funds on the project, feeling confident due to the representations made by the Defendants that the project's funding was a "done deal;"

(6) Plaintiff suffered injury as a result, because Plaintiff lost a hundred thousand dollars to the Defendants and suffered addition financial losses due to the failure of the project Plaintiff had spent time and money on.

(7) That the Defendants had discussed the Plaintiff's project with numerous lenders in New York and Texas and investments banks, when the Defendants had made no such efforts.

(8) That the Defendants had arranged for funding through lenders he had prior interactions and relations with when in fact there were no lenders with whom the Defendants had made funding arrangements with.

(9) In initial phone conferences with Defendants Epshteyn and Tammaro in the Fall of 2014 the project was discussed in much detail; in each of those discussions, the

Plaintiff raised concerns regarding the potential difficulties of receiving sufficient funding for its project through the Defendants' efforts and sources.

## XV.    Eleventh Cause of Action–Restitution and Unjust Enrichment

124.    Plaintiff realleges and incorporates by reference the allegations contained in foregoing paragraphs. Defendants, and each one of them, engaged in conduct described above, directly or indirectly.

125.    Restitution is also known unjust enrichment. Black's Law Dictionary states:

> Instances of unjust enrichment typically arise when property is transferred by an act of wrongdoing (as by conversion or breach of fiduciary duty), or without the effective consent of the transferor (as in a case of mistake), or when a benefit is conferred deliberately but without a contract, and the court concludes that the absence of a contract is excusable — as when the benefit was provided in an emergency, or when the parties once seemed to have a contract but it turns out to be invalid… The resulting claim of unjust enrichment seeks to recover the defendant's gains.

126.    Defendants illegally obtained $100,000.00 from Plaintiff through manipulative tactics which induced Plaintiff to tender the payments.

127.    Because Defendants did not produce any substantial results and merely took the $100,000.00 under the guise of procuring funds, they must give Plaintiff the money back.

128.    Defendants were not authorized to receive the two payments of fifty thousand dollars each, made on behalf of Sigma, with moneys owned by Sigma, because the Defendants induced the Plaintiff to make these payments under false pretenses, assurances and guarantees that these payments were being made towards Defendants efforts to raise funding for the Plaintiff's project—as evident from the facts in section V, the Defendants never had any intentions of making any efforts to raise the fund, in fact, they engaged in an elaborate fraudulent scheme to deprive the Plaintiff of possession of the $100,000.

129.   Plaintiff alleges that Defendants:

(1) Made material representations to the Plaintiff.  Defendants' representations that funding was a "done deal" and that Defendants had lined up a number of solid funding sources was material to the success of the business venture Plaintiffs required funding for;

(2) Representations made by Defendants were false.  The material representations, regarding the status of the funding through a number of allegedly "solid sources" made by Defendants' were false, because when the Plaintiff inquired, by placing a phone call to Madison Capital, as to the status of funding progress with Madison Capital for Plaintiff's project, the Plaintiff was informed that the Defendants' had made no contacts with Madison Capital regarding the funding of the Plaintiff's project.  In fact, Plaintiff was advised that Madison Capital hadn't even heard of the Defendants.  In addition, Madison Capital explained to the Plaintiff that the way it was set up regarding potential projects they might be interested in, Texas did not fall within that model—they were mainly interested in local New York City business ventures;

(3) when the Defendants made representation to Plaintiff, the Defendants knew they were making false representations and made these representations recklessly without any knowledge of the truth and Defendants made these representation as a positive assertion, because when the Defendants claimed, on behalf of Madison Capital that they were interested in Plaintiff's project, they never bothered to research or inquire with Madison Capital whether they would even be interested in a project located outside of New York City—all they had to do was call

Madison Capital, or research the ongoing projects Madison Capital was involved in to see whether they are an entity which funds projects located in the Southern Unites States;

(4) Defendants made these representations with the intent that the Plaintiff should act upon these representations, Defendants did so because they wanted the Plaintiff to get even deeper involved with their project; specifically, with the purchase of the land parcels, so that the Plaintiff would feel pressured to continue to make additional payments to the Defendants, in hopes of getting the project funded; especially, because of increasing difficulties to walk away from the project, since the Plaintiff would have been committed to purchasing the land parcels;

(5) Plaintiff acted in reliance on the representations made by the Defendants, because based on the representations made by the Defendants, Plaintiff continued to spend time and funds on the project, feeling confident due to the representations made by the Defendants that the project's funding was a "done deal;"

(6) Plaintiff suffered injury as a result, because Plaintiff lost a hundred thousand dollars to the Defendants and suffered addition financial losses due to the failure of the project Plaintiff had spent time and money on.

(7) That the Defendants had discussed the Plaintiff's project with numerous lenders in New York and Texas and investments banks, when the Defendants had made no such efforts.

(8) That the Defendants had arranged for funding through lenders he had prior interactions and relations with when in fact there were no lenders with whom the Defendants had made funding arrangements with.

(9) In initial phone conferences with Defendants Epshteyn and Tammaro in the Fall of 2014 the project was discussed in much detail; in each of those discussions, the Plaintiff raised concerns regarding the potential difficulties of receiving sufficient funding for its project through the Defendants' efforts and sources.

130. Thus, Defendants through their manipulative tactics and concocting falsities induced Plaintiff to tender to them a sum of $100,000.00 and in return offered no compensation. Defendants must return the $100,000 because if they do not do so they will have been unjustly enriched.

## XVI.   PRAYER

**WHEREFORE**, the Plaintiff requests that the Defendants be cited to appear, and that on final hearing of this cause the Plaintiff have judgment as follows:

1. Damages in the amount of $100,000.00, which it was delivered at the time of the contract, a sum that is within the jurisdiction limits of the court.

2. Exemplary damages in the amount of at least $200,000.00, which is twice the amount of the Plaintiff's economic damages.

3. Post judgment interest at the rate permitted by law on actual and exemplary damages until the judgment is paid.

4. Court costs and reasonable attorney's fees, expert witness fees, and costs for copies of depositions.

5. Pre-judgment interest at the highest rate allowed by law.

6. Other and further relief to which the Plaintiff may be justly entitled.

## Jury Demand

Plaintiff respectfully demands a trial by jury.

Respectfully submitted,

Azhar Chaudhary Law Firm, PC

/s/ Azhar Chaudhary
Azhar M. Chaudhary
State Bar No. 24082804

/s/ Alfred Valdez
Alfred R. Valdez,
State Bar No. 20426200
Of Counsel

/s/ Zack Huang
Zack S. Huang.
State Bar No. 24094735
Of Counsel

1208 Highway 6 South, Suite B
Sugar Land, Texas 77478
Telephone: 281-265-1010
Facsimile:  281-265-1011

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically submitted for filing a true and correct copy of the above and foregoing Plaintiff's First Amended Complaint, in accordance via the CM/ECF of the Southern District of Texas, on 8 September 2016 to:

Christopher R Murray
cmurray@diamondmccarthy.com
Michael D. Fritz
mfritz@diamondmccarthy.com
909 Fannin Street, 15th Floor
Houston, TX 77010

/s/Azhar Chaudhary
Azhar Chaudhary

/s/ Alfred Valdez
Alfred R. Valdez, Of Counsel

/s/ Zack Huang
Zack S. Huang. Of Counsel

57